## NATIONAL LABOR RELATIONS BOARD v. FAULTLESS CASTER CORPORATION.

### No. 8237.

Circuit Court of Appeals, Seventh Circuit.

May 14, 1943.

Russell Packard, and Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and Roman Beck and Julian R. Wilheim, Attys., National Labor Relations Board, all of Washington, D. C., for petitioner.

Paul H. Schmidt, of Evansville, Ind., for intervenor.

Isidor Kahn, of Evansville, Ind. (William F. Little, of Evansville, Ind., on the

brief), for respondent Faultless Caster Corporation.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

KERNER, Circuit Judge.

This matter is here on the petition of the National Labor Relations Board for a decree enforcing its order against the respondent, Faultless Caster Corporation, upon charges filed by the United Electrical, Radio & Machine Workers of America, affiliated with the C. I. O. (hereafter designated as the "United").

The order is based upon the Board's conclusions that the respondent was guilty of unfair labor practices within the meaning of § 8(1) (2) and (3) of the National Labor Relations Act, 29 U.S.C.A. § 158 (1–3), in that it interfered with, restrained, and coerced its employees in the exercise of their rights guaranteed in § 7 of the Act, 29 U.S.C.A. § 157; that it dominated and interfered with the formation of the Independent Hardware Workers Union, an unaffiliated labor organization (hereafter designated as the "Independent") ; and that the respondent had in violation of § 8(3) demoted an employee because of his union membership and activities. The order directs the respondent to cease and desist from the unfair labor practices found and to take affirmative action by withdrawing recognition from the Independent as the representative of any of the respondent's employees; by disestablishing it as such representative; and by offering to reinstate and make whole the employee discriminated against. The matter was originally heard by a trial examiner where the Board, the respondent, and the Independent (the Independent having been allowed to intervene) were each represented by counsel. No jurisdictional question is involved.

The record discloses that prior to 1941 there was no labor organization in respondent's plant at Evansville, Indiana, where it employs about 350 production workers in manufacturing casters and furniture hardware. However, after the employees had organized United, respondent's foremen and supervisory employees made spirited and fiery remarks to the employees such as "the C. I. O. is a bunch of communists and crooks," which tended to arouse and kindle anti-union sentiments among the employees; threatened to discharge them if they did not join the Independent; advised them to "lay off" the United, that employee activity in the United was "bad stuff" and to "steer clear of it," that eventually all of the C. I. O. members would be "weeded out," and that the management wouldn't have to suffer because "they could close their doors and go to Florida." One of the supervisors urged a United steward to support the Independent, stating that she was wasting her time with the C. I. O. because the management would "never recognize the C. I. O."; and respondent's vice-president informed the employees that while they had the right to join a union of their own choice, respondent would shut down its plant "if pressed too hard by any union."

Respondent makes the point that it cannot be charged with the activities of Highland and Metz because they were not supervisory employees, and that there is no evidence to show that it encouraged or sanctioned their conduct.

It is now well settled that foremen may be management representatives and their acts attributable to the employer, and that actual employer authority is not of controlling importance, H. J. Heinz Co. v. National Labor Relations Board, 311 U.S. 514, 520, 61 S.Ct. 320, 85 L.Ed. 309. Highland and Metz each directed and supervised the work of a group of employees and, after consultation with their foremen, had the power to recommend wage increases and to lay off their subordinates. Thus, the evidence abundantly shows that their positions were such that the employees did have just cause to believe that these supervisory employees were acting for and on behalf of the respondent, International Ass'n of Machinists v. National Labor Relations Board, 311 U.S. 72, 80, 61 S.Ct. 83, 85 L.Ed. 50, and it has been held that conduct such as above related is violative of § 8(1) (2) of the Act. National Labor Relations Board v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 1226; H. J. Heinz Co. v. National Labor Relations Board, supra; National Labor Relations Board v. Aintree, 7 Cir., 132 F.2d 469.

Respondent and Independent contend that there is no evidence that the respondent initiated the Independent in order to combat the efforts of the United, even though it be true that the chief reason for the formation of the Independent was to keep out the United. The argument is that the formation of the Independent was the spontaneous reaction of a group of the employees

without suggestion or help by the respondent. In other words, that the finding of the Board is not supported by substantial evidence.

As before noted, prior to 1941 there was no labor organization in the plant. On January 18, 1941, United launched its campaign for membership and within a few days the employees began to wear union buttons, of which fact Noelting, respondent's vice-president, and Davidson, its plant manager, had knowledge. Three days later, one Walter Schmidt, an employee, began to organize the Independent and was elected president. In addressing the employees who attended the first meeting, Schmidt, whose brother was married to Davidson's daughter, stated that he (Schmidt) realized that the officers of the Independent were "too closely related and hooked up with the management" but "it was the best they could do at the time," since "the job had to be done in order to keep the C. I. O. out." It was during this period that Noelting told the employees, at meetings called by the respondent, that "there would be meetings from time to time to determine the conditions in the shop and to better anything that could be bettered, * * * that it wouldn't make any difference to us [the employees] in our jobs, whether we joined an inside or outside union, that our jobs would still be the same, * * * that any of us who had joined a union * * * couldn't be forced into anything; that he [Noelting] couldn't understand why we were dissatisfied"; "that the plant worked steady, that there were very few layoffs, * * * that we had a right to join either an inside or an outside union, but * * * if they pressed him too hard, they would be forced to close the doors, * * * that they couldn't afford to pay any more wages, and * * * if he ever heard of either side threatening the other, * * * he would call the Black Annie out and have us taken to town"; and that during this same period respondent's foremen and supervisory employees advised the employees to join the Independent and threatened to discharge them if they did not. It also appeared that Metz warned employee Gossett, who worked under Metz's direction and who was a member of United, that he (Gossett) was "on the wrong side of the fence." "You are going * * * to change over and be an Independent man or it is out the gate for you." "I will

have to lay you off." On another occasion Metz told a group of employees that anyone who did not join the Independent could not work for him. It also appears that the Independent made no attempt to obtain better working conditions, higher wages, or to bargain collectively, and that although the United had on January 27 written to the respondent that it represented a majority of the employees and asked that a meeting be held for the purpose of collective bargaining, no reply was made to the request. All of these facts are significant and suggestive, and all must be considered.

■ It may be well to state here once again that the employee must be free from all restraint and coercion, and that the National Labor Relations Act imposes upon an employer total and complete impartiality and the utmost of honest neutrality, since even slight suggestions as to the employer's choice between an outside or inside union may have telling effect and constitute powerful support.

■ To us, the question appears to be—what inferences should be drawn from the evidence? It has been settled beyond question that that function belongs to the Board, and that we must accept what the Board has stamped with approval and credence if there is any evidence to support its conclusion.

■ It is clear that the events as a whole, the words and conduct of respondent's vice-president, plant manager, foremen and supervisory employees, the rapidity with which one event followed another, and the manner in which they were timed with reference to each other, National Labor Relations Board v. Stone, 7 Cir., 125 F.2d 752, warranted the Board in finding that the respondent's course of conduct was not a mere coincidence, but was planned and calculated to dominate and interfere with the formation of the Independent, cf. National Labor Relations Board v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368.

The Board found that the motivating cause for the demotion of one Bert Hudson was his interest in the unionization of respondent's employees and his membership in and activities on behalf of the United.

The respondent contends that this finding is not supported by the evidence, and that the record shows that Hudson was demoted because he was unable or unwilling to master a new, skilled operation which he had been ordered to learn.

■ Without detailing here the testimony, but after reviewing the record relating to Hudson's demotion, we are of the opinion that from the entire record it was reasonable for the Board to infer that Hudson's membership in and his activities in behalf of the United were the real reason for his demotion.

■ Finally, it is contended that certain portions of the order ought to be modified and that paragraph 1(c) and 2(d) and subsection 3 of paragraph 2(d), being general and blanket in form, are too broad. Paragraphs 1(c) and 2(d) and subsection 3 of paragraph 2(d) in this case are identical in form with the order entered in the case of National Labor Relations Board v. Sunbeam Electric Mfg. Co., 7 Cir., 133 F.2d 856. We there held that the order was not too broad, since it met precisely the findings of the Board. For the reasons there assigned, these paragraphs are approved.

■ The remaining objections to the order will be sustained. The words "successors and assigns" in the preamble will be stricken; there will be inserted in paragraph 1(a) and (b) after the word "employees" the words "of their own choosing"; and there will be inserted in subsection 3 of paragraph 2(d) after the word "Organizations" the words "or any other organization of their own choosing."

The Board's order is modified and as so modified, its request for enforcement is granted. The Board may present a decree in conformity with our conclusions.