## NATIONAL LABOR RELATIONS BOARD v. LITCHFIELD MFG. CO.

No. 13211.

Circuit Court of Appeals, Eighth Circuit.

April 22, 1946.

Stanley M. Silverberg, Atty., Department of Justice, of Washington, D. C. (David A. Morse, Gen. Counsel, A. Norman Somers, Asst. Gen. Counsel, and Owsley Vose, and Reginald Parker, Attys., all of Washington, D. C., were on the brief), for petitioner.

B. F. Swisher, L. J. Cohrt, and Swisher, Cohrt & Swisher, all of Waterloo, Iowa, for respondent.

Before GARDNER, JOHNSEN, and RIDDICK, Circuit Judges.

GARDNER, Circuit Judge.

This matter is before us on a petition for enforcement of an order of the National Labor Relations Board directed to the respondent, Litchfield Manufacturing Company. The complaint was based upon charges preferred by United Farm Equipment and Metal Workers of America, C.I.O. The order of the Board required respondent to cease and desist from certain practices, and to take certain affirmative action. The cease and desist provisions of the order required respondent to cease and desist from: (a) Discouraging membership in United Farm Equipment and Metal Workers of America, C.I.O., or any other labor organization of its employees, by dis-charging, laying off, or refusing to reinstate or reemploy any of its employees, or by discriminating in any other manner in regard to their hire or tenure of employment or any term or condition of their employment; (b) in any other manner interfering with, restraining or coercing its employees in the exercise of the right to self-organization, to form labor organizations to join or assist United Farm Equipment and Metal Workers of America, C.I.O., or any other labor organization, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the National Labor Relations Act, 29 U.S.C.A. § 157.

The affirmative actions required were: (a) Offer to Robert Smith and Lois Smith immediate and full reinstatement to their former or substantially equivalent positions without prejudice to their seniority or other rights and privileges; (b) make whole said Robert Smith and Lois Smith for any loss of pay that they may have suffered by reason of the respondent's discrimination against them, by payment to each of them of a sum of money equal to the amount that he normally would have earned as wages from the date of the respondent's discrimination against him to the date of the respondent's offer of reinstatement, less his net earnings during such period; (c) post the usual notices furnished by the Regional Director; (d) notify the Regional Director of the steps taken to comply with the order.

The order also vacated and set aside the election held January 19, 1945, and the result thereof. The cease and desist order was based upon findings entered by the Board after hearing upon due notice. These findings in effect sustained all the substantial allegations of the complaint. Respondent challenges the sufficiency of the evidence to support the findings.

Respondent is an Iowa corporation, with its principal place of business at Waterloo, Iowa, and for many years has been engaged in that city in the manufacture, sale and distribution of farm implements, machinery and equipment. The United Farm Equipment and Metal Workers of America, which we shall hereafter refer to as the union, began a campaign for the organization of respondent's plant in October, 1944. Sponsors of the campaign distributed leaf-

lets outside of the plant and called upon the employees at their homes, soliciting them to join the organization. After the initiation of the campaign, and on October 16, 1944, the union requested recognition by the Company as the exclusive bargaining representative of its employees. The request was denied and the Board directed that an election be held among the employees to determine whether or not they desired to be represented by the union. An election was accordingly held January 19, 1945, resulting in a defeat of the union.

Among the acts of alleged unfair practices found by the Board and shown by the evidence may be noted the following: On October 5, 1944, Earl Mayer, superintendent of respondent's plant said to an employee, "If the union gets in here we'll go to forty hours a week." The employees were then working at least fifty-two hours a week. George Grimes, respondent's general foreman, about the middle of October, 1944, warned two employees that their work week would be cut down if the union came in, and that if the union got in the employees would only get forty hours a week, "or else maybe no work at all." Grimes during this same period inquired of another employee how the union's membership drive was progressing, adding that, "If the union went in it would go to forty hours a week," suggesting also that if the union won the election the employees would have more frequent lay-offs, due to the fact that respondent would discontinue its practice of transferring employees from one type of work to another, in order to keep them busy. I. L. Myers, foreman of the corn picker department, during this pre-election period, threatened a group of five employees that if the union won the plant might close down entirely. Referring to certain photographs of the plant which were being taken during this period, Myers said to an employee that the pictures were being taken for another concern which was going "to take over the plant after the union went in." On the day preceding the election Myers said to an employee that if the union won the election, respondent would lose an important contract for the manufacture of corn pickers. To another employee who was active in promoting the interests of the union he advised the employee that he was foolish to join the union "because you might get a better job out of it." Myers said to an employee that he was "in line for a week's vacation,"

and that they would "stand by him" if he would "just stick in there and keep pulling with us, and we'll see that this union doesn't get in here." Inspector Otto Mrotzek, on the day of the election, in conversation with an employee over whom he seemed to have had supervision, urged him to vote "No" at the election, declaring that he would be discharged if the union won, but that he would receive a raise in pay if it were defeated.

█ These activities on the part of supervisory representatives of respondent contained threats of reprisal and were coercive in character and violative of the right of the employees freely to organize and choose their bargaining representative. This evidence, substantial in character, was, we think, sufficient to sustain the finding of unfair labor practices within the meaning of Section 8(1) of the Act, 29 U.S.C.A. § 158(1). N.L.R.B. v. Brashear Freight Lines, 8 Cir., 119 F.2d 379; N.L.R.B. v. American Pearl Button Co., 8 Cir., 149 F.2d 311; Gamble-Robinson Co. v. N.L.R.B., 8 Cir., 129 F.2d 588; N.L.R.B. v. Crown Can Co., 8 Cir., 138 F.2d 263; N.L.R.B. v. Laister-Kauffman Aircraft Corp., 8 Cir., 144 F.2d 9; N.L.R.B. v. Viking Pump Co., 8 Cir., 113 F.2d 759.

The Board found that Robert Smith and Lois Smith were on December 26, 1944, discharged because of their union activities, and that respondent had since failed and refused to employ them. Based upon this finding respondent is required to offer these former employees reinstatement with payment for any loss in earnings by reason of their discriminatory discharge. The Smiths became interested in the campaign to organize the union at the Litchfield plant soon after organization efforts began and they distributed membership applications among fellow employees, and Lois Smith secured the signatures of five or six other employees to these applications. There is substantial agreement as to the circumstances under which they left the employment of the company. They were engaged in the corn picker department. Their particular work in that department was completed and the department was to change into production of trailers with reduction in the number of employees required. On the completion of their work the inspector sent them to Superintendent Mayer. Lois Smith testified as follows with reference to her conversation with Mr. Mayer:

"I said, 'We come up to be reassigned,' and he said they were done making corn pickers and that they'd be building trailers and it wouldn't take as many people so we was going to get a lay-off. He didn't come right out and say 'lay-off' but I asked him, 'Do you mean this is a lay-off then.' and he said, 'Yes.'

"Q. Did he give you any termination slip, or notice of separation? A. No, he never gave us any of those, but he said in three months that if we wanted to come back that we could."

Robert Smith testified relative to the same incident as follows:

"We told him (Mr. Mayer) we had come for reassignment and he asked who sent us. We told him Otto Mrotzek, and he told us there wouldn't be any more work at the present time because the corn-pickers—they'd finished assembling those and was going to start making trailers and wouldn't need so many workers for that job, therefore was going to be laid off for a period of three months and if we wanted to come back at the end of that time we could."

Mr. Mayer in his testimony referring to this conversation with the Smiths said:

"Well, I told them that we were—corn picker assembly work was just about over and I think I told them that they always had been pretty 'choosey' about their jobs around there, and I didn't think they'd like anything that I had to offer them, and we was going to lay them off; that when the corn picker started back again and if they were willing to come back and wanted to come back we'd have a job for them."

The other testimony bearing on this incident was that of organizer Ackerson, who testified to having had a conference with the General Manager, Jochumsen, relative to the eligibility of Robert Smith and Lois Smith to vote at the election. Ackerson contended that they should be placed on the roll as eligible to vote. He testified as follows:

"Q. And what did Mr. Jochumsen say to you? A. He says, 'Well, they were fired.'

"Q. Then what was said? A. And he says, 'Just a minute, I'll go and look 'em up.' He goes and looks 'em up and says, 'No, they was laid off.'"

In explanation of why Robert and Lois Smith were not on the eligible list Mr. Jochumsen testified:

"When I was making up this list I called the employment office (U. S. Employment Office) and they told me that they could not come back to our place and were not considered as eligible to come back, and therefore we left them off the list; when they were given another job and were there seven days, they were frozen to that job and therefore they no longer had any connection with Litchfield."

Referring to the conversation to which Mr. Ackerson testified, the witness testified as follows:

"Q. Did you state that they were fired? A. No, sir.

"Q. Did you bring out your records to check their status as far as the records revealed? A. Yes, I went and looked at the record to see.

"Q. Then what did your record disclose? A. They were laid off."

It will be recalled that it was not Mr. Jochumsen who had the conversation with the Smiths, but he testified from the record.

█ It appears from the undisputed evidence that immediately after leaving the employ of respondents, the Smiths secured other employment and both they and the officers of the respondent thought this employment "froze them" to their new jobs and hence, they were not eligible for reemployment by respondent. The Smiths never asked to be reemployed or reinstated, and the respondent never sought to offer them further employment until charges were filed in this case to the effect that respondent had discharged the Smiths on December 26, 1944, and failed to offer them reinstatement. So far as appears from this record the notice of these charges was the first knowledge that respondent had indicating that the Smiths were eligible to reinstatement. Both the Smiths and the respondent's representatives acted on the assumption that they were not eligible to such reinstatement and that was the advice which respondent had from the United States Employment Office. Had they been right in this assumption it would, of course, have been idle, if not a breach of regulations, to have offered to reinstate them, and failure to do so under these circumstances could scarcely be said to be evidence of bad faith. Neither do we think it was evidence of bad faith that respondent, having the matter sharply brought to its attention by this charge of having violated the law, should at once have communicated with

the Smiths and requested them to report for work if they were in fact so eligible. We think it conclusively appears from the testimony that the Smiths were not discharged December 26, 1944, but laid off; that they immediately secured other employment, of which employment respondent was advised, and, as above observed, both the Smiths and the respondent in good faith believed that they were frozen in their jobs and hence were not eligible for reinstatement and presumably acted upon that assumption. The finding of discharge is not sustained by substantial evidence.

The order is therefore modified by striking therefrom the provision for the reinstatement of Robert and Lois Smith and as so modified the order will be enforced.